

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. PD-0771-12

**THE STATE OF TEXAS**

**v.**

**ANTHONY DURAN, Appellee**

## ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW
## FROM THE EIGHTH COURT OF APPEALS
## EL PASO COUNTY

COCHRAN, J., delivered the opinion of the Court in which MEYERS, PRICE, WOMACK, JOHNSON, KEASLER, HERVEY and ALCALA, JJ., joined. KELLER, P.J., concurred.

### O P I N I O N

When Anthony Duran made a left-hand turn in front of a speeding police car, the police officer braked, turned to follow, pulled Mr. Duran's car over, and eventually arrested him for DWI. Mr. Duran filed a motion to suppress, claiming that the officer did not have reasonable suspicion to stop him. The trial judge granted the motion, the State appealed, and

the court of appeals reversed the trial judge's ruling.[1]  The issue before us is whether an appellate court must defer to a trial judge's factual findings which, when viewed piecemeal and in isolation, may be ambiguous, but, when read in their totality, reasonably support his legal conclusion.[2]  It must.  A reviewing court must apply the same non-technical, common-sense deference–not only to the trial judge's individual factual findings, but also to the totality of those findings–that it uses to assess a magistrate's determination of probable cause.[3]   This case depends upon a single fact, not any legal issue: Did the police officer actually see a traffic violation before he detained Mr. Duran?  The trial judge's findings indicate that he did not.  We must defer to that determination of fact.

---

[1] *State v. Duran*, No. 08-10-00365-CR, 2012 WL 983188, *4–5 (Tex. App.—El Paso March 21, 2012) (not designated for publication).

[2] We granted the following three grounds for review:
1.    Did the court of appeals err as a matter of federal law in ruling that an objective basis for the traffic stop can arise after a traffic stop has been initiated, or must probable cause/reasonable suspicion exist before the traffic stop is initiated?
2.    Did the court of appeals err in substituting its findings of fact for those of the trial court, which were based on reasonable inferences from the testimony adduced at the suppression hearing, or was the court of appeals free to ignore these reasonable inferences?
3.    Was it proper for the court of appeals to supply material facts to its Opinion in deciding that the trial court had erred in granting suppression relief in Petitioner's case, or should it have remanded the case so that these material facts could first be decided by the trial court below before deciding the suppression matter presented?
We resolve this case under the second issue, and therefore dismiss the first and third issues.

[3] *See Bonds v. State*, ___ S.W. 3d ___, 2013 WL 1136522, *4 (Tex. Crim. App. March 20, 2013).

I.

Officer Gabriel Candia[4] of the El Paso Police Department was on patrol with his partner one night when he received a domestic-violence dispatch call at 2:35 a.m. Officer Candia responded to that call and sped southbound on Zaragoza Street. Despite his high rate of speed and running of a red light, Officer Candia did not turn on his emergency lights or siren. Meanwhile, Mr. Duran was driving northbound on Zaragoza, and he made a left turn in front of Officer Candia. The officer hit his brakes and, from the far-left lane, made a right turn onto Saul Kleinfeld Drive to follow Mr. Duran. As Officer Candia was completing his turn, Mr. Duran's tire briefly crossed the center yellow line on Saul Kleinfeld. Two seconds later, Officer Candia turned on his emergency lights and siren to make a traffic stop. After investigating, Officer Candia arrested Mr. Duran for DWI.

At the suppression hearing, Officer Candia testified that he believed Mr. Duran failed to yield the right-of-way when making the left turn. He said, "What I felt he did was to make the turn . . . in such a manner that made me decelerate and, as a matter of fact, I recall hitting the brakes. At that point it caught my attention obviously." So Officer Candia "proceeded to make a right turn [and] follow the vehicle." He stated, "What caught my attention then was that I noticed that the vehicle had crossed into–crossed the double yellow line."

When asked on cross-examination exactly when he decided to stop Mr. Duran, Officer

---

[4] The court reporter spelled Officer Candia's name as "Candi," but, as the State notes, the officer wrote his name as "Candia" on his complaint affidavit, and the trial judge used the name "Candia" as well. We shall adopt the officer's spelling of his name.

Candia responded, "Once I saw that he failed to yield the right-of-way to me, and again when I saw him going into on-coming traffic, that is when I determined to make the stop[.]" Officer Candia agreed that he made "an important decision" to pull away from the domestic-violence dispatch call to turn right and stop Mr. Duran instead.

After the State rested, Mr. Duran called Roy Davis, a former police commander, who testified that a car turning left generally must yield to an oncoming car, but that is not the case if the oncoming car is exceeding the speed limit. In such cases, the speeding car has lost the right-of-way. Based on a review of the DVD recording of the stop, Mr. Davis determined that Officer Candia was traveling at 60.5 m.p.h. in a 45 m.p.h. zone.[5] Based on his viewing of the DVD, Mr. Davis concluded that "the officer's action clearly shows that the decision [to stop Mr. Duran] was made when he made the turn behind the defendant."

After hearing the testimony and reviewing the DVD recording of the traffic stop, the trial judge made the following pertinent findings of fact:

7.      After the Defendant made his left turn, his tires briefly drifted over the center stripe. There was no oncoming traffic and no danger associated with that event.

8.      The Court finds that Officer Candia most probably did not even see the center stripe violation because he did not mention it in his report.

9.      In any event, the center stripe violation played no part in Officer Candia's decision to stop the Defendant.

10.     The Court finds it to be totally beyond all credibility to assume that an officer, while speeding and running red lights to respond to an assault

---

[5] The State later stipulated to the legality of Mr. Duran's left turn.

family violence call, would abandon that call, turn right from the far left lane and pull up behind a driver (who at that time committed no infractions) just to see if he might then commit one.

11.    The Court finds that Officer Candia made a clear and unconditional decision to stop the Defendant solely on the basis of what Officer Candia erroneously believed to be an unlawful left turn. This is what Officer Candia wrote in his report (which made no mention of any center stripe violation) and is the only scenario which could conceivably justify abandoning an assault family violence call.

12.    Officer Candia was wrong in his opinion about the Defendant's turn. The turn was not unlawful in any respect. Indeed, the State admits that Defendant's turn was lawful.[6]

Concluding that Officer Candia "made this stop solely on the basis of [Mr. Duran's] left turn," the trial judge granted the motion to suppress.

The State appealed, arguing that, because the DVD "clearly shows" that Mr. Duran's tire crossed the double-yellow line while Officer Candia was behind him, the reasonable-suspicion requirement for a traffic stop was met. The court of appeals agreed. It explained that the reasonable-suspicion determination uses an objective standard and the "DVD recording provides an objective justification for the stop."[7] It reversed the trial judge's ruling because he had focused on Officer Candia's "subjective reasons for effectuating the stop."[8]

---

[6] The trial judge drafted his own findings of fact, rather than adopting those proposed by the defense.

[7] *Duran*, 2012 WL 983188, at *5.

[8] *Id.*

II.

A.

An officer must have reasonable suspicion that some crime was, or is about to be, committed before he may make a traffic stop.[9] Critical to that reasonable-suspicion analysis is whether the stop is supported by "specific and articulable facts" at its very inception.[10] The almost exclusive inquiry appropriate to determining the lawfulness of a traffic stop is whether the officer had "a pre-existing sufficient quantum of evidence to justify the stop."[11]

In determining whether an officer is justified in making a *Terry* stop, courts use an objective standard:  Would a reasonable officer in the same situation believe a crime had been or was being committed?  This objective standard requires reviewing courts to place themselves in the shoes of the officer at the time of the inception of the stop—considering only the information actually known by or available to the officer at that time.[12]  The court

---

[9] *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

[10] *Terry*, 392 U.S. at 21; *United States v. Sharpe*, 470 U.S. 675, 675-76 (1985) (applying *Terry* to traffic stop; the reasonableness of an investigative traffic stop turns on "'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'" ); *Martinez v. State*, 348 S.W.3d 919, 923 (Tex. Crim. App. 2011) ("To justify further investigation, the state must show that, at the time of the detention, the officer had specific, articulable facts that established reasonable suspicion.").

[11] 4 WAYNE R. LaFAVE, SEARCH AND SEIZURE § 9.3(a), at 472-73 (5th ed. 2012).

[12] *Martinez*, 348 S.W.3d at 925 (officer lacked reasonable suspicion for investigatory detention of pickup truck driven by defendant based on an anonymous caller's report that a pickup truck of the same make and color had picked up two bicycles; "Before he approached the truck after the stop, Officer Hurley did not see any bicycles in the bed of appellant's truck, nor

then asks, "[W]ould the facts available to the officer at the moment of the seizure or search warrant a man of reasonable caution in the belief that the action taken was appropriate."[13]

Normally, this inquiry "presents no significant problem, for most traffic stops are made based upon the direct observations of unambiguous conduct or circumstances by the stopping officer."[14] But sometimes an issue arises as to what the officer actually saw or knew at the time that he made a traffic stop.

Information that the officer either acquired or noticed after a detention or arrest cannot be considered.[15] A detention is either good or bad at the moment it starts. For example, a

---

did he have any other reason to stop the truck. The specific, articulable, corroborated facts known by the officer at the time of the stop were minimal.").

    An exception to that rule (not applicable here) is the "collective knowledge" doctrine, in which several officers are cooperating and their cumulative information may be considered in assessing reasonable suspicion or probable cause. *See Derichsweiler*, 348 S.W.3d at 914-15 ("[T]he detaining officer need not be personally aware of every fact that objectively supports a reasonable suspicion to detain; rather, 'the cumulative information known to the cooperating officers at the time of the stop is to be considered in determining whether reasonable suspicion exists.'") (citations omitted).

    [13] *Davis v. State*, 947 S.W.2d 240, 243 (Tex. Crim. App. 1997).

    [14] LaFave, *supra* note 11 at 473.

    [15] *Amores v. State*, 816 S.W.2d 407, 415 (Tex. Crim. App. 1991) ("In reviewing a warrantless arrest to determine the existence of probable cause, we look to the facts known to the officers at the time of the arrest; subsequently discovered facts or later-acquired knowledge, like the fruits of a search, cannot retrospectively serve to bolster probable cause at the time of the arrest."); *State v. Wilson*, 337 S.W.3d 289, 296 (Tex. App.–Texarkana 2011, no pet.) ("Because Brownlow did not discover the existence of the burger until after initiation of the investigative detention, this information could not be used to corroborate the tip."); *Atkins v. State,* 919 S.W.2d 770, 774 (Tex. App.–Houston [14th Dist.] 1996, no pet.) ("Subsequently discovered facts or later-acquired knowledge, like the fruits of a search, cannot retrospectively serve to bolster probable cause at the time of the arrest."); *see also Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009) (facts to support finding of probable cause "must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support

police officer who stops a driver for speeding and later discovers that he was wrong about that fact, cannot justify his stop by noting that the driver was also not wearing a seat belt if he had not seen that violation before the stop. And that same officer cannot justify his bad stop for speeding by noting that a DVD of the stop shows that the car had a faulty tail light if the officer had not noticed the broken light before the stop. A post-hoc rationalization for a traffic stop cannot be made on the basis of information learned personally or acquired from other officers after the stop.

On the other hand, if the officer did, in fact, see that the driver was not wearing a seat belt before the stop, then that known fact would support probable cause to stop the driver even though that was not the officer's subjective rationale for the stop.[16] If the facts that the officer knows "at the inception of the detention" support a finding of reasonable suspicion or probable cause to conduct a traffic stop, then it is irrelevant that the officer subjectively

---

an earlier arrest."); *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006) ("Probable cause exists if an officer reasonably believes, in light of the facts known to her at the time, that a suspect had committed or was committing an offense. . . . [C]ourts must focus on the real world situation as known to the officer at that time.").

[16] *See Devenpeck v. Alford*, 543 U.S. 146, 152–53 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest[,]" but that officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause. As we have repeatedly explained, 'the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action.'") (some quotation marks omitted).

decided to stop the driver for a bad reason.[17]  A good reason did exist, and the officer knew

of that good reason at the time he made the stop.

B.

Appellate courts afford almost total deference to the trial judge's determination of

facts (if those facts are supported by the record) when they review a suppression ruling.[18]

That same deferential standard of review "applies to a trial court's determination of historical

facts [even] when that determination is based on a videotape recording admitted into

evidence at a suppression hearing."[19]  Although appellate courts may review *de novo*

"indisputable visual evidence" contained in a videotape,[20] the appellate court must defer to

the trial judge's factual finding on whether a witness actually saw what was depicted on a

videotape or heard what was said during a recorded conversation.[21]

---

[17]  *Id.* (the "officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause.").

[18]  *State v. Weaver*, 349 S.W.3d 521, 525 (Tex. Crim. App. 2011); *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011); *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997).

[19]  *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006).

[20]  *See Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) ("[T]he nature of the evidence presented in the videotape does not pivot 'on an evaluation of credibility and demeanor.' Rather, the videotape presents indisputable visual evidence contradicting essential portions of [the officer's] testimony. In these narrow circumstances, we cannot blind ourselves to the videotape evidence simply because [the officer's] testimony may, by itself, be read to support the Court of Appeals' holding.").

[21]  *See State v. Gobert*, 275 S.W.3d 888, 891–92 & n. 13 (Tex. Crim. App. 2009) ("[T]he trial judge viewed the DVD with the State's transcript in hand, and he found that the appellee did in fact actually declare, 'I don't want to give up any right though, if I don't got no lawyer.' The record supports that conclusion, even as it might also support a different conclusion. Therefore,

Appellate courts view the evidence in the light most favorable to the trial judge's ruling–whether he grants or denies the motion.[22] The winning side is afforded the "strongest legitimate view of the evidence" as well as all reasonable inferences that can be derived from it.[23] We review a trial judge's application of search and seizure law to the facts *de novo*, and will affirm his ruling if the record reasonably supports it and it is correct on any theory of law applicable to the case.[24]

## III.

The sole question in this case is a simple factual one:  Did Officer Candia actually see Mr. Duran's "center stripe violation" before he detained him?  The trial judge decides that fact.  The court of appeals does not.  We do not.  And appellate courts must view the trial judge's factual findings in the light most favorable to his ultimate conclusion.

After hearing the witnesses and reviewing the DVD, the trial judge determined that Mr. Duran's center-stripe violation "played no part" in Officer Candia's decision to initiate a traffic stop.  The trial judge further found that Officer Candia "most probably" did not even see the violation.  By mentioning it twice in two separate findings, the trial judge gave

---

we will not second-guess the trial court's determination of the facts. . . . Under these circumstances, it is appropriate that we defer to the trial court's primary fact-finding function.").

[22] *State v. Garcia–Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008); *Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007).

[23] *Weaver*, 349 S.W.3d at 525; *Woodard*, 341 S.W.3d at 410.

[24] *Weaver*, 349 S.W.3d at 525;  *Valtierra v. State*, 310 S.W.3d 442, 447-48 (Tex. Crim. App. 2010); *Wiede v. State*, 214 S.W.3d 17, 25 (Tex. Crim. App. 2007);  *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006).

particular significance to the fact that Officer Candia never mentioned the "center stripe violation" in his offense report.[25]    The totality of the trial judge's findings support a reasonable conclusion that the trial judge did not believe that Officer Candia saw the center-stripe violation before detaining Mr. Duran.  The trial judge reasonably could have concluded that Officer Candia never saw that event until he watched the DVD before testifying.

The court of appeals, however, did not give the trial judge's factual findings any deference because none of them—considered piecemeal—reflected a specific credibility determination.[26]  The court of appeals also reasoned that the trial judge did not need to make a credibility judgment because the DVD showed that Mr. Duran's tires did cross the yellow line.[27] Considering the finding that Officer Candia "most probably did not even see the center

---

[25] The court of appeals stated that the record did not support these specific findings, in part, because "no such report is a part of the record." *Duran*, 2012 WL 983188, at *4.  But Officer Candia's complaint affidavit–signed on the day of the offense–is on page 4 of the clerk's record, and it makes no mention of the center stripe violation.  Rather, it states, in relevant part,

> On 12-18-2009, on or about 0235 Hrs, at 1700 Saul Kleinfeld in the city and County of El Paso, Texas Affiant and partner R. Wells #2540, working as 3F193 while [in route] to a call.  As the affiant and partner approached the intersection of Zaragoza and Saul Kleinfeld, the affiant and partner observed the Defendant operating the listed vehicle make a left turn from Zaragoza and onto Saul Kleinfeld, failing to yield right of way to the marked unit.  The affiant and partner made contact with the Defendant and [noticed a] very strong odor of burnt Marijuana emanating from the vehicle.

[26] *Id.* at *5. The court of appeals considered only findings seven through nine as relevant to an objective analysis.

[27] *Id.* ("Because Officer Candi[a]'s testimony that he observed the violation is supported by the recording of the event, the trial court's finding does not turn on an evaluation of credibility and demeanor. Rather, it turns on objective evidence, the recording.").  Of course, the trial judge was not required to believe Officer Candia's testimony.

The court of appeals characterized the trial judge's ruling as being based on his belief that

stripe violation because he did not mention it in his report," the court of appeals stated, "[i]n practical effect, the qualifier 'most probably' renders this fact finding meaningless[.]"[28]

The court of appeals then concluded that the trial judge's ruling was not based on a credibility determination but was the result of the application of an incorrect, subjective standard.[29]  Reviewing the case *de novo*, the court of appeals reversed the trial judge's decision to grant the motion to suppress because the DVD showed that Mr. Duran's car wheels did briefly cross the double yellow line.

But, in this case, the DVD supports the very real possibility that Officer Candia did not actually see Mr. Duran's "center stripe violation" before he initiated the stop two seconds later, as he had not even completed his own right-hand turn from the left-hand lane when it occurred.  The trial judge could reasonably infer that Officer Candia was paying attention to his own safe braking and turning, rather than being attuned to the camera's view of Mr. Duran's tire.

The question of whether an officer has reasonable suspicion to detain an individual for further investigation is determined from the facts and circumstances actually *known* to the officer at the time of the detention–what he saw, heard, smelled, tasted, touched, or

---

the officer was unable to point to specific facts justifying the stop, *id.* at *4, and dismissed as irrelevant many of the trial judge's findings, noting that they "relate to the subjective intent of the officer in making the stop, which we have already determined not to be the appropriate standard." *Id.* at *5.

[28] *Id.* at *4.

[29] *Duran*, 2012 WL 983188, at *5.

felt–not what that officer could have or should have known.[30]  The standard is not what an omniscient officer would have seen, but rather what a reasonable officer would have done with what he actually did see.  Here, the trial judge was entitled to disbelieve Officer Candia's testimony that he made the stop after seeing the center stripe violation.[31]

The State points to two cases to support the court of appeals's *de novo* review in this case.  In both cases, we disregarded fact findings that were contradicted by video recordings.  In *Carmouche v. State*,[32] we held that the record did not support the trial judge's implicit finding of "clear and convincing" consent to search.[33]  The video in *Carmouche* showed the defendant pulled over on the side of a darkened highway, closely surrounded by four police officers who had him spread-eagled beside his car, with one officer reaching for the crotch area of his pants when he allegedly gave consent.[34]  And in *Miller v. State*,[35] we disregarded

---

[30] *Kolender v. Lawson*, 461 U.S. 352, 368 (1983) (reasonable suspicion "depends solely on the objective facts known to the officers and evaluated in light of their experience"); *Terry v. Ohio*, 392 U.S. at 30.

[31]  *Supra*, at 4.

[32]  10 S.W.3d 323 (Tex. Crim. App. 2000).

[33] *Id.* at 332.

[34]  *Id.* at 331-32.  We explained,
In the unique circumstances of this case . . . we decline to give "almost total deference" to the trial court's implicit findings under which the Court of Appeals found consent. First, we note that the trial court seems to have predicated its decision to admit the evidence on a finding of probable cause rather than on consent. Second, the nature of the evidence presented in the videotape does not pivot "on an evaluation of credibility and demeanor." Rather, the videotape presents indisputable visual evidence contradicting essential portions of Williams' testimony. In these narrow circumstances, we cannot blind ourselves to the videotape evidence simply because Williams' testimony may, by itself, be read to

some of the trial judge's findings because they were contradicted by events recorded by police-car cameras and body microphones.[36] But this case is not like *Carmouche* or *Miller*. Here, the court of appeals failed to give "almost total deference" to the trial judge's implied fact finding that Officer Candia did not see the center stripe violation–a finding that is based on an evaluation of credibility, not one that is contradicted by "indisputable visual evidence."

As we have recently reiterated, "a question 'turns' on an evaluation of credibility and demeanor 'when the testimony of one or more witnesses, if believed, is *always* enough to add up to what is needed to decide the substantive issue.'"[37] In this case, the entire issue of

---

support the Court of Appeals' holding.
*Id.* at 332.

[35] ___ S.W.3d ___, 2012 WL 5869416 (Tex. Crim. App. Nov. 21, 2012).

[36] *Id.* at *6. For example, the trial judge had found that "[t]he record is silent as to whether any other persons were known to have been in the other rooms or areas of the apartment at the time of the events described at the hearing; thus the officers were not aware if a third party was present on the scene at the time of their investigation. Two children were finally determined to be asleep in a bedroom." But the recordings revealed that the officers recognized upon entry that Miller was the only adult present, accepted her assurances that the only other persons in the apartment were her "babies" and made no attempt to search the apartment for her boyfriend or her children. We noted,

> When there are factual disputes regarding testimony or the contents of a videotape, the trial court's findings of historical fact are afforded almost total deference. But when evidence is conclusive, such as a written and signed agreed stipulation of evidence or "indisputable visual evidence," then any trial-court findings inconsistent with that conclusive evidence may be disregarded as unsupported by the record, even when that record is viewed in a light most favorable to the trial court's ruling.

*Id.* (quoting *Tucker v. State*, 369 S.W.3d 179, 187 (Tex. Crim. App. 2012) (Alcala, J., concurring)).

[37] *Abney v. State*, ___ S.W.3d ___ 2013 WL 1222711, *14 (Tex. Crim. App. March 27, 2013) (quoting *Loserth v. State*, 963 S .W.2d 770, 773 (Tex. Crim. App. 1998)).

reasonable suspicion or probable cause to stop Mr. Duran depends upon the single factual issue of whether Officer Candia did or did not see the "center stripe" violation before he initiated the detention. That factual finding depends entirely upon the trial judge's credibility assessment of Officer Candia's testimony concerning that specific fact.

The State is correct that there is "indisputable visual evidence" that the center stripe violation occurred before Officer Candia stopped Mr. Duran. But there is no indisputable visual evidence that Officer Candia saw that violation. And that is what matters.[38] Because the record supports the trial judge's conclusion–based upon the totality of his factual findings–that Officer Candia did not see the "center stripe violation," and that he stopped Mr. Duran solely on the basis of his left-hand turn in front of the speeding patrol car,[39] we uphold the trial court's ruling.

We therefore reverse the judgment of the court of appeals and reinstate the judgment of the trial court.

Delivered: April 17, 2013
Publish

---

[38] *Tucker*, 369 S.W.3d at 185 ("The court of appeals should view the video in the light most favorable to the trial court's ruling and assume that the trial court made implicit findings that support" that ruling); *State v. Gobert*, 275 S.W.3d 888, 891–92 & n.13 (Tex. Crim. App. 2009).

[39] Officer Candia's mistaken belief that appellant violated the law by turning left in front of him cannot provide any legal basis for detaining him. *See Robinson v. State*, 377 S.W.3d 712, 722 (Tex. Crim. App. 2012) ("An officer's mistake about the law, or about the legal significance of undisputed facts, *even if* eminently reasonable, cannot serve to provide probable cause or reasonable suspicion; it cannot, in other words, validate an otherwise invalid seizure."); *see also Abney*, 2013 WL 1222711, at *14("[A]n officer's mistake about the legal significance of facts, even if made in good faith, cannot provide probable cause or reasonable suspicion" to make a traffic stop).